# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                     Case No. 15-80960-WRS
                                                          Chapter 11

STACY L. DANLEY II
STEPHANIE DANLEY,

        Debtor

## MEMORANDUM DECISION

This Chapter 11 case came before the Court for hearing on October 14, 2015, on the
Debtors' Motion to Alter, Amend, or Vacate. (Doc. 71).[1] The Debtors were present by counsel
Lee R. Benton, Liberty Bank and Trust was present by counsel Kristen Abbott, and the
Bankruptcy Administrator was present by counsel Britt Griggs.

The Debtors request that the Court vacate its Order of September 17, 2015, granting
Liberty Bank and Trust *in rem* relief from the automatic stay pursuant to 11 U.S.C. §
362(d)(4)(B). (Docs. 58, 71). The Debtors also ask this Court to stay its order pending
consideration of its motion to alter, amend, or vacate. (Doc. 74). For the reasons set forth below,
the motion to alter, amend, or vacate is DENIED, and the motion to stay is DENIED AS MOOT.
In addition, the Debtors addressed this Court's Order to Show Cause entered September 22,
2015, requiring the Debtors to appear and show cause why this case should not be dismissed for
their failure to file statements and schedules. (Doc. 60). For the reasons set forth below, the
Court discharges its order to show cause.

---

[1] The Court will refer to documents in the Court's file for this case (i.e., Case No. 15-80960) solely by their docket numbers. When the Court refers to documents in other cases it will precede the docket number with the appropriate case number.

# I. FACTS

## A. Procedural Setting

Stacy and Stephanie Danley ("the Danleys") initiated this Chapter 11 case on July 22, 2015. (Doc. 1). On August 10, 2015, Liberty Bank and Trust ("Liberty Bank") filed a motion for relief from the automatic stay, seeking *in rem* relief pursuant to 11 U.S.C. § 362(d)(4)(B) on the grounds that the Danleys' July 2015 petition was part of a scheme to delay, hinder, or defraud Liberty Bank. (Doc. 36). The Danleys filed a response on August 31, 2015, opposing Liberty Bank's motion. (Doc. 48). The Court held an evidentiary hearing on September 16, 2015. At the conclusion of the hearing, the Court made findings of fact and conclusions of law on the record, granted Liberty Bank's motion for *in rem* relief from the automatic stay, and further instructed counsel for Liberty Bank to prepare an appropriate form for an order. (Doc. 67). The Court entered an order on the form provided by Liberty Bank's counsel on September 17, 2015. (Doc. 58). The Danleys filed a timely motion to alter, amend, or vacate on October 1, 2015. (Doc. 71). The Court heard oral argument on the Danleys' motion on October 14, 2015 and took it under advisement.

## B. Two Loans: Rental Properties and Personal Residence

This dispute centers on two loans made by Liberty Bank to the Danleys.[2] The first loan was made on September 1, 2005, in the principal amount of $264,000, and is secured by a mortgage on real property that the Danleys purchased as investment rental property in Auburn,

_____

[2] First Tuskegee Bank was the initial mortgagee. It merged into Liberty Bank, who now owns the mortgages. It is not necessary for the purposes of this discussion to distinguish between First Tuskegee Bank and Liberty Bank. For the sake of simplicity, the Court will simply refer to the mortgagee as "Liberty Bank."

2

Alabama.  This loan will be referred to as the "Rental Properties Loan."  The second loan was made on September 21, 2006, in the principal amount of $425,000, and is secured by the Danleys' personal residence in Auburn, Alabama.  The second loan will be referred to as the "Personal Residence Loan."[3]

## C.  The First Bankruptcy Case:  No. 07-31868

On November 1, 2007, Liberty Bank sent the Danleys a notice of default with respect to the Personal Residence Loan; at that point, the balance on it had grown to $427,546.08 and the delinquent balance was $9,961.50.  Liberty Bank also accelerated the Rental Properties Loan and scheduled a foreclosure sale for November 29, 2007.  In response to Liberty Bank's notice of default, the Danleys filed their first bankruptcy case on November 28, 2007.[4]  (Case No. 07-31868, Doc. 1).

The Bankruptcy Administrator moved to dismiss the Danleys' first case because they did not file monthly operating reports as required by the Court's Local Rules.[5]  (Case No. 07-31868, Doc. 94).  The Danleys did not respond to the Bankruptcy Administrator's motion and the Court dismissed the case on July 11, 2008.  (Case No. 07-31868, Doc. 96).

---

[3] In some of Liberty Bank's filings, it refers to the Rental Properties Loan as the "Residential Properties Loan."  As all of the properties in question here are residential real property, for clarity sake it is best to distinguish their personal residence from residential property that they hold to rent to others.

[4] This case was initially filed under Chapter 13, but was later converted to Chapter 11. (Case No. 07-31868, Doc. 39).

[5] This Court requires debtors-in-possession under Chapter 11 to file regular reports as required by the Bankruptcy Administrator.  LBR. 2015-1(a)(1).

3

## D. The Second Bankruptcy Case:  No. 08-32095

On August 8, 2008, Liberty Bank sent the Danleys a second notice of default on the Personal Residence Loan and gave them until September 10, 2008 to cure the default.  The loan balance had grown to $430,744.12 and the delinquency had grown to $40,641.38.  In response to the notice of default, the Danleys filed a second bankruptcy case on September 9, 2008.  (Case No. 08-32095, Doc. 1).  The Danleys proposed a Chapter 11 plan that called for the payment of the two loans in issue here, as well as several other debts.  (Case No. 08-32095, Doc. 60).  The Danleys proposed to pay the Personal Residence Loan over a 30-year period at 6% interest, with monthly payments of $2,740.00.  In addition, the Danleys acknowledged that the indebtedness on the Rental Properties Loan had grown to $275,460.59 and also proposed to pay it over a 30-year period at 6% interest, resulting in monthly payments of $1,652.00.  This Court confirmed the Danleys' Chapter 11 Plan on December 3, 2008.  (Case No. 08-32095, Doc. 67).

Although the Danleys confirmed a plan in their second case, they did not fund it.  On January 7, 2009, and again on February 5, 2009, Liberty Bank filed notices of default for both loans.  (Case No. 08-32095, Docs. 75 and 81).  A second secured creditor, Chase Bank, moved for relief from the automatic stay on March 10, 2009 because the Danleys had not made any post-confirmation payments towards its loan.  (Case No. 08-32095, Doc. 86).  A third secured creditor, Colonial Bank, moved for relief from the automatic stay on July 14, 2009 for the same reason.[6]  (Case No. 08-32095, Doc. 105).  Finally, the Danleys' counsel withdrew from representation because they would not perform under the terms of their confirmed plan, would

---

[6]  Chase Bank's loan was secured by different real property than that securing Liberty Bank's loans.  Colonial Bank was secured by means of a judgment lien.

4

not maintain contact with him, and would not pay him the attorney's fees he had earned. (Case No. 08-32095, Doc. 110). This Court eventually closed the Danleys' second bankruptcy case without granting them a discharge because they had failed to pay their quarterly fees. (Case No. 08-32095, Doc. 129).

### E. Civil Case No. 14-111–Lee County Circuit Court

On June 26, 2014, Liberty Bank sent two letters to the Danleys, advising them that the Personal Residence Loan and Rental Properties Loan had been accelerated, and scheduled foreclosure sales for July 21 and 22, 2014. On July 18, 2014, the Danleys filed a civil action against Liberty Bank in the Circuit Court for Lee County, Alabama, under Case No. CV 14-111 ("the civil action"). The Danleys, acting *pro se*, filed a motion for a temporary restraining order in an effort to stall Liberty Bank's efforts to foreclose its mortgages on both the residence and the rental properties.

On June 5, 2015, the Circuit Court granted Liberty Bank summary judgment in the civil action and assessed the Danleys with Liberty Bank's costs of defending the action. Copies of documents from the civil action were filed in this Court. (Doc. 57).

### F. The Third Bankruptcy Case: No. 14-80885

Apparently realizing that the state court would not grant a temporary restraining order in time to stop Liberty Bank's foreclosure sales, Stephanie Danley filed Chapter 13 bankruptcy on July 20, 2014. (Case No. 14-80885, Doc. 1). Stacy Danley did not join in filing the petition in this case.

5

Stephanie's Chapter 13 petition was met with a barrage of filings from outraged creditors. The first in line was the law firm of Espy, Metcalf & Espy, which sought relief from the co-debtor stay so that it could collect its unpaid attorney's fee from Stacy Danley.[7] (Case No. 14-80885, Doc. 20); *see also* 11 U.S.C. § 1301. Chase Bank objected to Stephanie's plan, noting that the Danleys were delinquent for 66 monthly payments, in the amount of $53,199.13, on its mortgage since the confirmation of the Danleys' last plan in December 2008. (Case No. 14-80885, Doc. 33). In other words, the Danleys had paid virtually nothing to Chase Bank since filing bankruptcy in 2008. Liberty Bank also moved for relief from the automatic stay as to the Rental Properties Loan. (Case No. 14-80885, Doc. 36).

Stephanie moved to dismiss her Chapter 13 case on October 16, 2014. (Case No. 14-80885, Doc. 38). The Court granted the motion to dismiss the following day. (Case No. 14-80885, Doc. 39). Because Stephanie did not confirm a plan, nothing was paid to creditors – all of the plan payments made by Stephanie were returned to her. (Case No. 14-80885, Doc. 46).

## G. The Fourth Bankruptcy Case: No. 15-80960

On June 4, 2015, Liberty Bank again sent the Danleys two letters giving notice of acceleration of the two loans, and scheduled a foreclosure sale for July 22, 2015. The indebtedness on the Rental Properties Loan had grown to $353,648.55 and the indebtedness on the Personal Residence Loan had grown to $457,544.34. Again, to stave off foreclosure, the

---

[7] Espy, Metcalf & Espy, the Danleys' lawyers in the second bankruptcy case, filed a proof of claim for $8,884.83 in their current bankruptcy case (Claim No. 6). Memory & Day, the Danleys' lawyers in the first bankruptcy case, filed a claim for $3,123.00. (Claim No. 3). Paul Esco, Stephanie Danley's lawyer in the third bankruptcy case, also went unpaid. (Case No. 14-80885, Docs. 40, 45). It appears that the Danleys have stiff-armed every lawyer who has represented them. (Stacy Danley played running back for Auburn University's football team.)

Danleys filed the instant Chapter 11 petition on July 22, 2015. (Doc. 1). Shortly after this latest petition was filed, Liberty Bank filed a motion for relief from the automatic stay in which it sought *in rem* relief, not just leave to bring its foreclosure proceedings.[8] (Doc. 36).

### 1. The Evidentiary Hearing

The Court held an evidentiary hearing on September 16, 2015. The parties filed a stipulation of facts, including 10 exhibits, that the Court accepted as findings of fact. (Doc. 57). In addition, Liberty Bank called as a witness Roger Dale Selph ("Selph"), a senior vice president for Liberty Bank and previously for First Tuskegee Bank, who had made the original loans to the Danleys. The Danleys testified on their own behalf.

### a. Defaults and Balances on the Loans

Selph's testimony was devastating to the Danleys' case. He testified that the balance on the Personal Residence Loan, which had been made September 21, 2006 in the amount of $425,000, had grown to $474,354.78. Thus, in the nine years since the Personal Residence Loan had been made, the Danleys had not only failed to make any payment toward principal, they had also accrued almost $50,000 in unpaid interest. Selph also testified that the Danleys had not made a payment on the Personal Residence Loan since November 2012, and that it was then more than $96,000 in arrears. Furthermore, the Danleys had allowed the property insurance that they were required to carry under the Personal Residence Loan to lapse in November 2010, forcing Liberty Bank to carry force-placed insurance at a cost of $25,641.45 to protect its collateral. The Danleys were also delinquent five years in paying property taxes on their residence, forcing Liberty Bank to pay the taxes in the amount of $12,159.

---

[8] The Court will discuss *in rem* relief in detail in Part II(D), *infra*.

7

The situation with the Rental Properties Loan was even more dismal. The Rental Properties Loan had been made September 1, 2005 in the amount of $264,000. Selph testified that its balance at the time of the hearing had grown to $363,398.13, nearly $100,000 more than the Danleys had borrowed ten years earlier, and that the Danleys had last made a payment in August 2011 and were in arrears $173,233.37 on the Rental Properties Loan. Selph further testified that the Danleys had failed to carry property insurance, as required by the Rental Properties Loan, since November 2010 and that Liberty Bank had maintained force-placed insurance at a cost of $19,306. Finally, Selph testified that Liberty Bank had paid $28,972 for taxes on the rental properties that the Danleys had failed to pay.

### b. The Danleys' Financial Situation

The Danleys testified that they intend to keep the rental properties and use rental income to fund a plan. However, the rental properties were vandalized in March 2011 and remain in disrepair, and the Danleys did not offer any evidence as to how much it would cost to repair the properties.[9] In addition, they did not have any feasible plan to come up with the money to make the repairs. Until the rental properties are repaired, they will continue to sit idle, generating no income. Liberty Bank received $65,000 in insurance proceeds due to the vandalism, but applied the proceeds to arrearage on the Rental Properties Loan.

The Danleys had not filed any schedules or a statement of financial affairs at the time of the evidentiary hearing. However, they offered evidence that Stacy Danley was awarded a money

---

[9] The Danleys posited in their response to Liberty Bank's motion for relief from the automatic stay that it would cost $60,000 to repair the property. (Doc. 48, para. 6). However, they did not offer any evidence at the September 16, 2015 hearing to support their assertion.

8

judgment on May 16, 2015, in proceedings against Alabama State University in the Montgomery County Circuit Court. <u>Danley v. Ala. State Univ.</u>, Case No. CV-2013-900181. It appears that the judgment consists of one part in the amount of $118,096.87 for back pay and another part for $22,120.00 for amounts improperly withdrawn from Stacy Danley's bank account, for a total of $140,216.87. The Court was informed that Stacy Danley's attorney's fees were paid by the teacher's union. As the $118,000 part was for back pay, presumably, taxes would have to be paid. No evidence was provided as to how much they would be. Assuming a deduction of one-third for income taxes, that would leave approximately $80,000, plus the $22,120 that the Court presumes would not be subject to taxes. While $102,000 would provide the Danleys a much needed financial shot in the arm, they did not explain how they would use the money or how a reorganization might look.

It was further disclosed that Alabama State University has prosecuted an appeal and that the Danleys will not receive anything until the appeals have been exhausted. No evidence was offered as to when that might be, and no estimate was made as to the likely outcome on appeal. While the judgment against Alabama State University is a point in the Danleys' favor, it is at this juncture something of a wild card. The Court considered the judgment in making its findings.

At the conclusion of the evidentiary hearing, the Court made findings of fact and conclusions of law, and ruled orally from the bench. The Court first determined that Liberty Bank lacked adequate protection and was entitled to relief from the automatic stay. The Court then concluded that each of the bankruptcies filed by the Danleys, plus the civil action in Lee County, had been filed in bad faith as part of a scheme to hinder, delay, or defraud Liberty Bank, and granted Liberty Bank *in rem* relief pursuant to 11 U.S.C. § 362(d)(4)(B).

9

## 2. The Motion to Alter, Amend, or Vacate

The Danleys have filed a motion to alter, amend, or vacate the Court's order granting Liberty Bank relief from the automatic stay. (Doc. 71). The Danleys assert that the Court erred in concluding that Stephanie Danley filed her Chapter 13 case in bad faith, noting that she filed a petition, schedules, a plan, and had two paychecks withheld. They also argue that the mere fact that Stephanie filed her Chapter 13 case on the eve of a foreclosure sale does not amount to bad faith.

In addition, the Danleys point out that the Court erred in determining that they had not made a written offer of adequate protection, when in fact they had offered monthly payments of $3,000. (Doc. 48). They further note that they have now filed schedules and a statement of financial affairs, and claim that they did not do so beforehand because they were told by staff at the Clerk's office that they did not need to.

## II. LAW

### A. Jurisdiction

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(G). This is a final order.

### B. Standard of Review

This case is before the Court on the Danleys' motion to alter, amend, or vacate, which is governed by Rule 59(e) of the Federal Rules of Civil Procedure (as incorporated by FED. R. BANKR. P. 9023). To prevail on such a motion, the moving party must prove:

1. An intervening change in the law,
2. Consideration of newly discovered evidence, or

10

3.  [The need t]o correct clear error or prevent manifest injustice.

In re Muhammad, 536 B.R. 469, 477 (Bankr. M.D. Ala. 2015); *see also* Eglin Fed. Credit Union v. Horlacher (In re Horlacher), 389 B.R. 257, 261 (Bankr. N.D. Fla. 2008).  The Danleys have made no showing of a change in the law or of newly discovered evidence.[10]

## C.  Relief From the Automatic Stay

The Court may grant a party relief from the automatic stay for cause, including a lack of adequate protection for the party's interest in property of the estate.  11 U.S.C. § 362(d)(1).  A debtor's bad faith in filing the petition may also supply the necessary cause.  Phoenix Piccadilly, Ltd., v. Meritor Sav. Bank (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394 (11th Cir. 1988); Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.), 825 F.2d 296, 297-98 (11th Cir. 1987); In re Club Tower, L.P., 138 B.R. 307, 310 (Bankr. N.D. Ga. 1991).  As the party moving for relief, Liberty Bank bore the burden of proof regarding the Danleys' equity in the properties.  11 U.S.C. § 362(g)(1).  As the parties opposing relief, the Danleys bore the burden of proof on all other issues.  11 U.S.C. § 362(g)(2).

The evidence of cause in this case was overwhelming.  The Danleys owe Liberty Bank almost $840,000 on their combined loans, and are more than $270,000 in arrears on them.  They have not made a payment on either loan since 2012.  Even worse, the Danleys have not paid taxes or maintained insurance coverage on their properties in five years, forcing Liberty Bank to cover both at a cost of over $86,000 (or more than $17,000 per year).

---

[10]  The Court does not consider the Danleys' tardily filed schedules to be "newly discovered evidence" within the purview of Rule 59(e).

11

The Danleys suggested that Liberty Bank should have used the $65,000 in insurance proceeds it received due to the vandalism of the rental properties to repair them. This implied criticism is misplaced. It was the Danleys' obligation to maintain insurance coverage on the properties, and the responsibility for allowing it to lapse lies squarely on their shoulders. Because Liberty Bank was forced to maintain its own insurance on the properties, Liberty Bank had discretion to apply the proceeds to the loan balance.

The Danleys point out that the Court erred in its oral ruling at the evidentiary hearing when it stated that they had not made a written offer of adequate protection. In fact they had, in the amount of $3,000 per month. (Doc. 48). However, this error does not carry the day for them because $3,000 per month is not adequate. As counsel for Liberty Bank pointed out at the evidentiary hearing, the Danleys' confirmed Chapter 11 plan from the second bankruptcy called for a combined monthly payment to Liberty Bank of $4,392. That amount was necessary to provide Liberty Bank adequate protection back in 2008, when the Danleys were far less delinquent on their loans than they are now, and when they were still paying taxes and paying for their own insurance. Moreover, it is not at all clear that the Danleys can afford to even pay $3,000 per month given their other secured debt, their income, and the uncertain value of Stacy Danley's judgment against Alabama State University. They certainly did not offer credible evidence that they could pay that much at the evidentiary hearing. Their Schedule J of expenses that they filed since then accounts for the $2,740 monthly payment on the Personal Residence Loan, but does not account for the Rental Properties Loan at all, nor leave sufficient net income to cover it. (Doc. 63).

12

The error pointed out by the Danleys is a drop in a large bucket of evidence that insuperably demonstrates Liberty Bank lacks adequate protection, and suggests the Danleys filed this case in bad faith. Liberty Bank is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

## D. *In Rem* Relief: 11 U.S.C. § 362(d)(4)

### 1. Standard for *In Rem* Relief

In addition to relief from the automatic stay, the Court granted Liberty Bank *in rem* relief pursuant to 11 U.S.C. § 362(d)(4)(B). That section requires a bankruptcy court to grant relief from the automatic stay with respect to real property "if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved . . . multiple bankruptcy filings affecting such real property." 11 U.S.C. § 362(d)(4)(B). An order of relief from the automatic stay that is entered pursuant to § 362(d)(4), as opposed to §§ 362(d)(1)-(3), has the following effect:

> If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

11 U.S.C. § 362(d) (hanging paragraph). In other words, a secured creditor who obtains relief from the automatic stay under § 362(d)(4) may record the order like one would record a mortgage or judgment lien, and the order of relief will be effective as to the subject real property in all

13

subsequent bankruptcy cases filed by anyone within the next two years.  Rodriguez v. Murphy, 2014 WL 1414424, *3-4 (S.D. Fla. Apr. 11, 2014); In re Spencer, 531 B.R. 208, 217 (Bankr. W.D. Wis. 2015); In re GEL, LLC, 495 B.R. 240, 249 (Bankr. E.D.N.Y. 2012); In re Montalvo, 416 B.R. 381, 386-88 (Bankr. E.D.N.Y. 2009); *see also* In re Henderson, 395 B.R. 893, 901-04 (Bankr. D.S.C. 2008).

*In rem* relief is extraordinary and not to be taken lightly.  The Court does not presume that a debtor who files bankruptcy is acting in bad faith, or to hinder and delay his creditors; yet all bankruptcy filings have at least the short-term effect of delaying creditors.  Moreover, many bankruptcy filings are made on the eve of a foreclosure, vehicle repossession, garnishment proceeding, or other debt collection device.  The timing of a bankruptcy filing does not by itself mean the filing is in bad faith, but timing may be a factor.  In addition, multiple bankruptcy filings, standing alone, may not meet the standard for *in rem* relief.  Whether a series of bankruptcy filings is, or is not, a scheme to delay, hinder, or defraud a creditor, must be determined based on the totality of the facts and circumstances of the cases, including the amount of the debt and arrearage and the length of the delinquency.

### 2. The Demerits of the Danleys' Prior Cases

At the outset, the Court notes that each of the Danleys' cases were filed on the eve of a scheduled foreclosure.  That in itself might not be sufficient evidence of a scheme to hinder or delay Liberty Bank, but it is if the cases themselves were not prosecuted in good faith.

Having a Chapter 11 bankruptcy case dismissed for the failure to file monthly operating reports, as happened in the Danleys' first bankruptcy case, is an utter failure of the case.  Such an outcome strongly suggests that the case was not filed in good faith and that there was no

14

intention to seek a reorganization of the Debtors' financial affairs. The Court expects that when a debtor files a petition in bankruptcy, the debtor will prosecute the case in good faith to a proper conclusion. Failure to file routine operating reports falls woefully short of that expectation. The Court found that the Danleys' first bankruptcy case was filed in bad faith – for the sole purpose of delaying Liberty Bank's realization of its collateral.

One might conclude that confirmation of the Danley's Chapter 11 Plan in the second case demonstrates that they were acting in good faith, removing any taint from the first case. However, as subsequent events made clear, the Danleys did not fund their Chapter 11 Plan, paying little or nothing to creditors. A promise to pay is not the same thing as actual payment. A Chapter 11 Plan that is confirmed but not executed – where little or nothing is paid to creditors – is as much in bad faith as a case that is dismissed for failure to file routine reports. The second case was filed in bad faith and, following hard upon the heels of the first case, shows a scheme to delay and hinder creditors. Indeed, the Court found that the Danleys' second case was a cynical misuse of bankruptcy in which the Danleys confirmed a plan that they did not intend to honor.

The Danleys' first two cases were somewhat less significant because of the passage of time since they were filed. That is not the case for their state court civil action or for Stephanie Danley's third bankruptcy. At the time she filed her Chapter 13 petition, Stephanie owed secured indebtedness of over $887,172.29. This consisted of $25,975 owed to Santander that was secured by a vehicle, $298,888.08 owed to Liberty Bank on the Rental Properties Loan, $438,115.06 owed to Liberty Bank on the Personal Residence Loan, and at least $124,194.23

15

owed to Chase Bank that was secured by other rental property.[11]  (Case No. 14-80885, Claim

Nos. 2, 5, 6).  Stephanie Danley was, and is, employed as a school teacher in the Auburn School

System, and takes home approximately $3,000 per month.  That amount of income is not nearly

sufficient to service almost $900,000 in secured debt.  *See* 11 U.S.C. § 1325(a)(5).

Further evidence of bad faith in the third bankruptcy case may be found in Stephanie

Danley's stated intent, in her Chapter 13 plan, to surrender the rental properties to Liberty Bank.

(Case No. 14-80885, Doc. 19).  There were two problems with this proposal.  First, as her

husband owns one-half interest in the property, Stephanie could not surrender the property

without his agreement.  Second, the Danleys to this day have not abandoned the rental properties.

Surrendering the rental properties would have reduced the amount of secured debt and thereby

reduced the amount of the payment necessary to service that debt, but it is clear based upon

subsequent events that Stephanie Danley did not intend to surrender the property.  Her act of

filing a plan that she did not intend to honor was yet another indication of bad faith.

At the October 14, 2015 hearing on the motion to alter, amend, or vacate, the Danleys

took issue with the Court's statement made at the September 16, 2015 hearing where it

concluded that Stephanie Danley's 2014 Chapter 13 case was filed in bad faith because, among

other reasons, nothing was paid to creditors.  Counsel for the Danleys noted that Stephanie

Danley had made two payments, contending that the Court had erred in concluding that the third

---

[11]  The amount owed to Chase Bank was taken from its motion for relief from stay in the
Danleys' second bankruptcy case.  The Court does not have an exact figure for the amount owed
Chase Bank in the third bankruptcy case, but it was undoubtedly much higher since they
apparently did not make a payment on Chase Bank's mortgage in the intervening years.  (Case
No. 14-80885, Doc. 33) (citing 66 missed mortgage payments from February 2009 through July
2014).

16

bankruptcy case was filed in bad faith. To a bankruptcy-savvy debtor, the filing of a Chapter 13 case and the dismissal of it prior to confirmation can be a useful strategy to delay creditors for free because money paid to the Chapter 13 trustee, but not yet disbursed, is refunded to the debtor. *Cf.* Harris v. Viegelahn, 135 S. Ct. 1829, 1839 (2015) (requiring undisbursed funds in a Chapter 13 trustee's possession to be returned to the debtor if he converts his case to Chapter 7). Because Stephanie Danley voluntarily dismissed her case without it being confirmed, all the money paid was returned to her and nothing was disbursed to creditors. (Case No. 14-80885, Doc. 46).

Viewing the third bankruptcy case in the context of the unpaid mortgages to Liberty Bank and Chase Bank – all of which had been the subject of the Danleys' second bankruptcy filing – it was apparent that nothing of value was accomplished in the third case. The 2014 petition was filed strategically in response to notices of acceleration sent by Liberty Bank. The Chapter 13 plan filed by Stephanie would never have been confirmed because it failed to provide for her secured debt. Moreover, she did not have nearly enough income to fund a plan meeting the requirements of Chapter 13 of the Bankruptcy Code. Certainly she recognized that her Chapter 13 filing was hopeless and that she could not proceed to confirmation. Having considered the Court's record in the third bankruptcy case, the backdrop of the first two bankruptcy cases and the civil action in state court, and the testimony offered by both Stephanie and Stacy Danley at the evidentiary hearing, the Court correctly concluded that the third bankruptcy case was filed by Stephanie Danley in bad faith and that it was part of a scheme to hinder and delay Liberty Bank, and other creditors, from realizing on their collateral.

### 3. Deficiencies of This Bankruptcy Case

As if the Danleys' prior bankruptcy cases were not damning enough, they have also performed miserably in meeting their obligations thus far in this bankruptcy case.

Debtors are required to file a complete set of Statements and Schedules, on forms prescribed by the Judicial Conference of the United States, within 14 days of the date of the petition. 11 U.S.C. § 521(a)(1); FED. R. BANKR. P. 1007(c). The Danleys did not file their Schedules until September 29, 2015 – thirteen days after the evidentiary hearing on Liberty Bank's motion for relief from the automatic stay and more than two months after they filed their petition in bankruptcy. (Doc. 63). Seriously tardy filings is an indicator of bad faith.

In Question No. 1 in the Statement of Financial Affairs, the debtor is called upon to "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business . . . from the beginning of this calendar year to the date this case was commended." (Doc. 63). The Danleys provided the following information:

> 0.00 Tax Return 2013 – Not yet filed
> 0.00 Tax Return 2014 – Not yet filed

(Doc. 63). The information provided by the Danleys in response to this question is non-responsive, demonstrably false, and incomplete. To begin, the question asks for "gross income." The fact that the Danleys have not filed tax returns for many years does not excuse them from answering the question. Certainly they should know what their gross income was for 2015 year-to-date, as well as the years 2013 and 2014. Moreover, the fact that they have not filed tax

18

returns does not mean that their gross income from employment or operation of business was zero. The non-responsive matter provided in the form by the Danleys is an evasion of the question. Their dishonesty in answering a straightforward question is still more evidence of their bad faith.

Debtors are further required to file, within 14 days of a petition, copies of payment advices they received from employers for a period of 60 days prior to the date of the petition. 11 U.S.C. § 521(a)(1)(B)(iv); FED. R. BANKR. P. 1007(c). The Danleys did not file their payment advices until September 29, 2015 and, again, did not comply with the statute. (Docs. 64, 65). To begin, 60 days of payment advices were called for but only one payment advice each was provided for both Stacy and Stephanie Danley. Moreover, the one payment advice filed by Stacy Danley was illegible. (Doc. 64). The Danleys' act of filing their payment advices late and incomplete, and in Stacy Danley's case illegible, is game-playing that is indicative of bad faith.

The Court acknowledges that the Danleys were acting *pro se* for a period of time during this case. However, they had an attorney for the first three weeks of this case and, when that attorney withdrew, the Court warned Stacy Danley of the need to file his schedules.[12] Moreover, the Danleys' current counsel entered an appearance on August 31, 2015, yet the Danleys still did

---

[12] Stacy Danley filed an affidavit in which he claims that a case administrator from the Clerk's office granted him an extension to file his schedules. (Doc. 71). The Clerk's office reported that he called several times, but that it did not grant him an extension. Stacy likewise blames the Bankruptcy Administrator for his tardiness, based on her statement that she did not file the notice of dismissal for failure to file schedules, because those notices are generated by the Clerk's office. However, this is not Stacy's first bankruptcy rodeo, or even his first ride in Chapter 11, and the Court expects him to command a clearer understanding of his obligations than it would a first-time filer. *See* In re Smith, 536 B.R. 478, 482 (Bankr. M.D. Ala. 2015) ("a debtor who makes frequent use of the bankruptcy courts is expected to be more knowledgeable of his obligations than a naif who may be truly ignorant of the bankruptcy laws"). The Court rejects Stacy's excuses and the assertions made in his affidavit.

19

not file their schedules or payment advices for another four weeks.  (Docs. 47, 63).  Thus, their temporary *pro se* status does not excuse their failure to meet their obligations in this case.

### 4.  Feasibility of Reorganization

The Court has already concluded that Liberty Bank lacks adequate protection.  *Supra* Part II(C).  However, the staggering size of the Danleys' arrearage and the length of their delinquency also indicated that this case was filed in bad faith.  Even with Stacy Danley's judgment against Alabama State University, the Danleys have no reasonable prospect of confirming a plan that would allow them to keep the properties securing Liberty Bank's mortgages.  When combined with the timing of their prior bankruptcy cases and the lack of good faith in which they were prosecuted, the futility of reorganization in this case is further evidence of a scheme intended to delay or defraud Liberty Bank.  *See* <u>Henderson</u>, 395 B.R. at 904 (holding that the "objective futility" of a reorganization is grounds for a finding of bad faith and for *in rem* relief).

The Court also gave great weight to the fact that the Danleys have not carried insurance or paid taxes on the properties for five years, preferring instead to freeload at Liberty Bank's expense.  It appears that the Danleys are attempting to see how long they can hold their property without paying anything to Liberty Bank, the tax collector, or the insurance man.  This is very strong, if not conclusive, evidence of a scheme to hinder or delay Liberty Bank in and of itself.

Liberty Bank offered a massive amount of evidence of bad faith, none of which was successfully rebutted by the Danleys.  The Court carefully considered the circumstances of the Danleys in this case as well as in their three previous bankruptcy filings, concluding that they are part of a scheme to delay and hinder Liberty Bank in its efforts to realize on its collateral.  Given

20

the Danleys' conduct in this case, and in their other cases, *in rem* relief is justified under 11 U.S.C. § 362(d)(4)(B).

### E.  Stay of *In Rem* Relief

The Danleys moved to extend the automatic stay beyond the 14-day period provided by Bankruptcy Rule 4001(a)(3),[13] pending a ruling on their motion to alter, amend, or vacate.  (Doc. 74).  In light of this ruling, that motion is now denied as moot.

### F.  Order to Show Cause

On September 22, 2015, the Court entered an order to the Danleys to show cause why their case should not be dismissed for their failure to timely file schedules.  (Doc. 60); *see* Tennant v. Rojas (In re Tennant), 318 B.R. 860, 869 (9th Cir. BAP 2004); In re Wishon, 410 B.R. 295, 305 (Bankr. D. Ore. 2009) (dismissing case notwithstanding the fact that amended schedules were filed prior to dismissal); LBR 1017-1.

A debtor's schedules and statement of financial affairs shall be filed within 14 days of the date of the petition.  FED. R. BANKR. P. 1007(c).  Upon a showing of cause, a court may extend the period.  In this case, the Danleys argue they were misled by erroneous advice from the Clerk's office.  The Court does not find Stacy Danley's affidavit convincing on this point.  *Supra* note 12.

While the Danleys did not seek an extension of time to file their schedules and statement of financial affairs and while the Court does not accept the Danleys' claim that they were misled

---

[13]  "An order granting a motion for relief from an automatic stay . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 4001(a)(3).

by the Clerk's office, the Court notes that the Danleys have now filed schedules, albeit more than one month tardy. The Court has been critical of much of the Danleys' conduct in this and in previous bankruptcy cases; nevertheless, it will not dismiss this case for the failure to timely file schedules and a statement of financial affairs.

## III. CONCLUSION

For eight years, the Danleys have flagrantly used and abused the bankruptcy process to thwart Liberty Bank's realization of its collateral, all at Liberty Bank's expense. That ends now. Liberty Bank has offered a mountain of evidence showing that the Danleys filed this case in bad faith as part of a scheme to delay and hinder its efforts to foreclose on its now wildly-in-default mortgages. The Danleys' motion to alter, amend, or vacate this Court's order granting Liberty Bank *in rem* relief from the automatic stay falls well short of the mark and is denied. This Court's Order of September 17, 2015, granting Liberty Bank *in rem* relief from the automatic stay, remains in full force and effect.

Done this 2nd day of November, 2015.

United States Bankruptcy Judge

c: Lee R. Benton, Attorney for Debtors
   Leonard N. Math, Attorney for Liberty Bank
   Teresa R. Jacobs, Bankruptcy Administrator